GENERAL MINNESOTA UTILITIES COMPANY v. CARLTON COUNTY COOPERATIVE POWER ASSOCIATION.[1]

April 26, 1946.

No. 33,965.

[1]Reported in 22 N. W. (2d) 673.

511

*McCabe, Gruber, Clure & Donovan,* for appellant.
*Leslie H. Blacklock,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff brought this suit to restrain defendant from furnishing electrical energy to a coöperative creamery located at Kettle River

in Carlton county. Plaintiff is a Delaware corporation duly licensed to do business in this state. It is engaged in generating and distributing for sale electrical energy as a public utility. Defendant, as its name suggests, is a coöperative organization, created and existing under the provisions of L. 1923, c. 326, and amendatory acts. It also is engaged in generating and disposing of electrical energy, but its business efforts have been devoted to rural areas beyond the confines of Kettle River. The village is a municipal corporation organized under the general laws of this state.

On August 6, 1929, the village enacted ordinance No. 19, providing substantially as follows:

"* * * That there be and hereby is granted to the R. P. Allen Company, a Delaware Corporation, their successors and assigns, during the period of twenty-five years, the *right* and *privilege of erecting and maintaining* in the streets, alleys and public grounds of said Village," poles, wires, and other fixtures and appliances "necessary to the business of furnishing electric light, power and heat for the public and private use of said Village," but, so the ordinance provided, "that any poles or wires used for furnishing light, heat or power, or telephonic communications which are now or may hereafter be lawfully erected and maintained" within the village should not be interfered with, "and that the location of said poles, masts, wires and other fixtures herein authorized shall be designated by the Village Council of said Village or by its duly authorized agent." (Italics supplied.)

The grantee, or its successors or assigns, was required, within ten days after the passage of the ordinance, to file its acceptance in writing of the terms and conditions of the ordinance, and that it would, within one year thereafter, be prepared to furnish adequate electrical current for the use of the village and its inhabitants.

Plaintiff has succeeded to the rights of the original grantee and for many years has been operating its plant there. In doing so, it has incurred an expenditure of some $50,000 in the installation of its plant, equipment, and other pertinent facilities.

Upon plaintiff's verified complaint and on its motion, the court, on March 31, 1942, issued an order to show cause and a temporary order restraining defendant and all persons acting under its authority from "erecting any poles, masts, wires, or any other electrical fixtures whatsoever" upon, along, or across any of the public streets, alleys, or grounds within the village limits of Kettle River, "and from doing any acts whatsoever to connect their electric lines with said creamery, * * * until further order of this court." This matter was returnable April 10. On April 23, 1942, the court granted the following temporary injunction:

"* * * It is Hereby

"ORDERED, that the defendant, its officers and agents, and all persons acting under it, refrain from erecting any poles, masts, wires, or any other electrical fixtures whatsoever, upon, along or across any of the streets, alleys, or public grounds of the Village of Kettle River, and from its generating plant of Kettle River, Minnesota, to the creamery of the Carlton County Cooperative Creamery Association, *and from doing any acts whatsoever to connect their electric lines with said creamery, and from doing any other acts whatsoever with reference to such matter* until the final judgment herein, or until further order of this court." (Italics supplied.)

(The portion italicized was stricken by the court's later order of January 28, 1943.) On April 20, 1942, defendant served its general demurrer to each of the three causes of action alleged in the complaint. The issue of law raised thereby has never been determined and, so counsel inform us, is still pending before the trial court. An examination of the files discloses that counsel for plaintiff, on June 15, 1942, wrote the judge having this matter in hand, saying:

"* * * I have agreed with Mr. Blacklock [counsel for defendant] to hear this Demurrer at any time he is ready. Because the Demurrer has been pending, no Answer has been filed. Accordingly we do not yet know what the [fact] issues may be."

On June 10, plaintiff served an amended complaint, which, however, as to cause, is in substance and effect the same as the original.

514

We find no answer or other pleading interposed by defendant. Apparently counsel have treated the original demurrer as still operative as to the amended pleading.

As we have shown, the order of January 28, 1943, struck from the prior injunction an important and substantial part thereof. The reason for so limiting the original injunction may be found, we think, in the court's memorandum, where the court observed that "plaintiff has a franchise * * * defendant has not; *but the Village may grant an identical franchise to the defendant whenever it may legally decide to do so."* (Italics supplied.) The italicized part clearly shows that the court deemed the first injunction too far-reaching when it prohibited defendant from connecting its service wires with the creamery. The creamery was the only user of electricity located within the village whose service was at any time threatened by defendant. The whole difficulty in this litigation is directly traceable to the mutuality of interest and ownership of defendant and the creamery—both coöperative enterprises. As a member of defendant, the creamery naturally wanted electric service from that source. Both the creamery and defendant are farmer-owned and controlled.

On February 25, 1943, on plaintiff's motion, an order was made requiring defendant to show cause why it "should not be punished as and for contempt of court for violation of the temporary injunction heretofore issued." On March 22, the court adjudged defendant in contempt for "violation by it of the temporary injunction * * * and as punishment therefor" imposed a fine of $100. (On October 25 the penalty or fine was stricken by the court.) In the meantime, defendant evidently had not been idle, since we find that on February 9, 1943, the village council passed a resolution, enlarged and clarified as of April 17, 1943, so as to read as follows:

"RESOLUTION

"Resolution made by Nikkola and 2nd by Gresczyk and passed by all members present to amend permit given under Res. No. 3 Village of Kettle River meeting Feby 9th 1943, and the following permit to govern.

"Permit granted to the Carlton County Coop. Power Assn. and Kettle River Coop. Cry. Assn. of Kettle River, Minn., to run electric wires across Cedar Street and Second Ave. near the cooperative creamery in the Village of Kettle River, for the purpose of getting Electric power from the Carlton County Coop. Power Assn. plant to the Kettle River Coop. Creamery Assn. according to the state code.

"Providing that the Carlton County Coop. Power Assn. and the Kettle River Coop. Cry. Assn. assumes and pays for all legal entanglements or other matters if any arise, from this permit, which affects the village of Kettle River, Minn.

"This permit to take effect from the date of this meeting.

"Meeting held April 17th, 1943, all members of council present."

On April 22, 1943, defendant procured an order requiring plaintiff to show cause why the temporary injunction of January 28, 1943, should not be further amended as follows:

"ORDERED, that the defendant, its officers and agents, and all persons acting under it, refrain from erecting poles, masts, wires, or any other electrical fixtures whatsoever, upon, along or across any of the streets, alleys, or public grounds of the Village of Kettle River; *except this Order shall not prohibit the Carlton County Co. operative Power Association and the Kettle River Cooperative Creamery Association from placing, running and using electric wires across Cedar Street and Second Avenue near the Cooperative Creamery in the Village of Kettle River, for the purpose of getting electric power from the Carlton County Power Association plant to the Kettle River Cooperative Creamery Association, and said Carlton County Cooperative Power Association from furnishing and selling electric power to said Kettle River Cooperative Creamery Association to be furnished to and transmitted over said electric power line."* (Italics supplied.)

That hearing was returnable May 3, 1943. On May 5, the court, on plaintiff's motion, issued an order to show cause why the creamery association should not be joined as a party defendant. Both

motions were heard later, and on September 8, 1944, the court granted defendant's motion to amend. By the same order, plaintiff's motion to join the creamery association was denied. Since this is the order from which plaintiff has appealed, we deem it appropriate to consider the court's reasons for reaching the conclusion that the injunction should be thus limited. In its memorandum, we find the answer, for there the court said:

"It is not denied that the municipality could grant to defendant a general franchise for the transmission and sale of electric power, nor is it claimed that the franchise of the plaintiff in that regard is exclusive." Furthermore, "in the instant case the defendant merely seeks to do what the Village Council of Kettle River intended that it should have the right to do. * * * The same power that granted a general franchise to the plaintiff granted a much lesser privilege and right to the defendant. * * * Where the municipality has a right to grant a general franchise for the distribution of electric power, this Court believes that it has the right to grant something less than that in the nature of a permit" such as was here granted.

These various motions and orders were supported and opposed by numerous affidavits. From these, and the complaint as well, some further facts may be adduced.

The creamery had been in operation long before plaintiff entered the field. It owned and operated its own steam power plant and continued to do so over a period of years after plaintiff had constructed its distributing system in the village. In 1937, defendant was organized under L. 1923, c. 326, as amended (Minn. St. 1941, § 308.05 [Mason St. 1927, § 7834]). Its corporate functions fit into the REA federal setup. The creamery is a member thereof, as are other users of electric power to the extent of some 2,000 members in all. In 1940, defendant built its own power plant at Kettle River with money furnished by federal agencies. As security for the money so provided, it executed mortgages upon all its physical properties, rights, and franchises in the amount of more than $400,000. Because plaintiff's service had often proved inefficient

and inadequate by reason of interruptions in service resulting from storms and other difficulties, the creamery sought connection with defendant's plant, which is located close to the creamery, whereas plaintiff's plant is located at MacGregor, some 30 or more miles away from Kettle River. The creamery is across the Soo Line right of way directly north of the plant of defendant, which had theretofore constructed a rural service line running immediately west and north of the village limits. Its system extends into four counties—Carlton, St. Louis, Pine, and Aitkin. The power-line connection between defendant's plant and the creamery is located in the northwest corner of the village, and the creamery owns lots on both sides of a street which exists only on paper, since it has never been improved or opened for use.

While conceding that plaintiff has certain franchise rights, defendant claims that it also has secured similar rights to the extent authorized by the order here for review. In that behalf, it asserts that the ordinance upon which plaintiff relies is one "granting permission" only to the extent of exercising "the right and privilege of erecting and maintaining" poles and fixtures in the streets and public places of the village. It calls attention to the fact that the ordinance provides "that the location of said poles, masts, wires and other fixtures" is to be "designated" by the village council or its authorized agent. At any rate, so it maintains, all that plaintiff has is a nonexclusive right to use the village streets and alleys to construct, maintain, and operate its service facilities until the village determines to grant the same or similar rights to another. It asserts that the village has granted such right under the resolutions of February 9 and April 17, 1943.

Plaintiff concedes that its franchise is not an exclusive one, but that, as between it and defendant, in the circumstances recited, "its legal effect is that of an exclusive franchise because none other has been issued [granted] to anyone [else] by a competent authority"; furthermore, that defendant is not a public utility and for that reason is incapable "of enjoying the rights and privileges of a franchise." In support, Frost v. Corporation Comm. of Okla-

homa. 278 U. S. 515, 49 S. Ct. 235, 73 L. ed. 483, is cited as of decisive authority to sustain its claim. Plaintiff's position, therefore, amounts to this: That defendant is actively and wrongfully seeking to enter into, and has in fact entered into, competition with it in its field of operation within the village, a field exclusively its own, and, for reasons already recited, that its activities in this respect should be enjoined.

■ First to be considered is defendant's lawful powers and authority under our statute. As stated, it was organized under and in accordance with the provisions of L. 1923, c. 326, as amended (Minn. St. 1941, § 308.05 [Mason St. 1927, § 7834]), which provides:

"A cooperative association may be formed for the purpose of conducting any * * * electrical heat, light or power business, * * * or for any other lawful purpose, upon the cooperative plan; * * * and, in addition, any other rights, powers, or privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the expressed provisions of those sections [§§ 308.05 to 308.18]."

The sections of the statutes mentioned are not involved in this litigation.

Villages of the Kettle River class are given certain statutory powers, amongst which the following are deemed pertinent here. Section 412.19, subd. 1 (Mason St. 1941 Supp. § 1186, subd. 1), provides:

"The village council shall * * * have power to adopt, amend, or repeal all such ordinances, rules, and by-laws as it shall deem expedient for the purposes set out in subdivisions 2 to 25."

By subd. 21—

"The village council shall have power to provide for lighting the village streets, buildings, or grounds by gas, electricity, or other means, and to contract with anyone engaged in the business of furnishing gas or electric service for the supply thereof to the village and its inhabitants."

And by § 455.12 (§ 1252)—

"*Any village* in the state *is authorized and empowered to contract with any person,* firm, corporation, or municipal corporation *for the purchase of electric energy* for municipal purposes to be distributed and supplied by such municipality to the inhabitants thereof." (Italics supplied.)

■ Plaintiff cites and relies upon State ex rel. Clapp v. Minnesota Thresher Mfg. Co. 40 Minn. 213, 225, 41 N. W. 1020, 1025, 3 L. R. A. 510, 518, where we said:

"* * * The definition of a 'franchise' given by Finch, adopted by Blackstone, and accepted by every authority since, is 'a royal privilege or branch of the King's prerogative, subsisting in the hands of a subject.' To be a franchise, the right possessed must be such as cannot be exercised without the express permission of the sovereign power,—a privilege or immunity of a public nature which cannot be legally exercised without legislative grant."

Granting that defendant is not possessed of "a royal privilege" and that it is not a "branch of the King's prerogative," the fact remains that it has been given "express permission" by "the sovereign" to engage in the electrical light and power business. It was organized "for the purpose of conducting [an] * * * electrical heat, light or power business," obviously a "lawful purpose" and within the provisions of our law. § 308.05 (§ 7834). For many years it has made use of that authority. Without question, too, is the fact that plaintiff has only a nonexclusive and limited franchise. To transform that franchise into one of exclusive privilege, even as to defendant, would do violence to the clear limitations of plaintiff's charter power.

We have mentioned plaintiff's contention that Frost v. Corporation Comm. of Oklahoma, 278 U. S. 515, 49 S. Ct. 235, 73 L. ed. 483, is decisive authority of the legal problem here presented. Judge Fesler, who issued the order of January 28, 1943, struck from the original injunction this provision:

"and from doing any acts whatever to connect their electric lines with said creamery, and from doing any other acts whatsoever with reference to said matter."

In discussing the Frost case in his memorandum, he said that, while he deemed "the opinions of the dissenting justices * * * more convincing than does the majority opinion, the majority opinion is the law * * * and so it must be followed here." That case was decided by a divided court—five to four. It will be noted that the court there was considering an Oklahoma statute, under the terms of which (278 U. S. 519, 49 S. Ct. 237, 73 L. ed. 487) the defendant "commission may deny a permit for the operation of a gin where there is no public necessity for it, and may authorize a new ginning plant only after a showing is made that such plant is a needed utility." The gist of that decision is stated in the first two syllabus paragraphs of 73 L. ed. 483 as follows:

"The right to operate a cotton gin and collect tolls therefor under a statute declaring such business to be a public utility, to be permitted only in case of public necessity, is not a mere license, but is a franchise granted in consideration of the performance of public service, and constitutes property within the protection of the 14th Amendment to the Federal Constitution.

"A franchise to operate a public cotton gin is exclusive against one who attempts to do so without obtaining a permit, or under a void permit."

In the later case of Alabama Power Co. v. Ickes, 302 U. S. 464, 58 S. Ct. 300, 82 L. ed. 374, the court carefully considered the Frost decision and distinguished the facts presented in the Alabama case from those in the Frost case. In the Alabama case, plaintiff was authorized under its charter (302 U. S. 476, 58 S. Ct. 302, 82 L. ed. 376)—

"to manufacture, supply and sell electrical energy throughout the State of Alabama. Among other communities served by its system are the four municipalities here involved, from each of which it has a

non-exclusive franchise giving it the right to construct, maintain and operate within the municipality an electricity-distribution system."

The Alabama company was a taxpayer in each of the four municipalities and attacked the federal act under which Ickes was proceeding to divert public funds to such use as would result in direct injury to its rights and property investments. The opinion brushed these objections aside, saying (302 U. S. 480, 58 S. Ct. 304, 82 L. ed. 378):

"* * * these municipalities have the right under state law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. *If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results.*

"What petitioner anticipates, we emphasize, is damage to something it does not possess—namely, a right to be immune from lawful municipal competition." (Italics supplied.)

In our case, the village could, under the doctrine laid down in the Alabama case, have installed and operated its own electrical municipal power plant notwithstanding plaintiff's franchise. Possessed of that authority, we can see no reason why it could not grant to defendant the right to provide the creamery with electric service. The distinction to be drawn between the Frost and the Alabama cases is simply this: In the Frost case, there was an unlawful act on the part of the one seeking to enter the field, because it was without authority so to act; in the Alabama case, on the other hand, there was nothing unlawful done or threatened by the involved municipalities. As a result, mere competition resulted; and this, under its franchise, afforded the Alabama company, as the complaining party, no ground for relief. Since defendant here is possessed of the statutory right to construct and maintain electrical distribution systems, the prohibition involved in the Frost case is not here presented. Even though defendant be not considered a public utility, it nonetheless has authority granted by the state to engage in this kind of business.

Plaintiff, under its grant of authority, cannot in the circumstances here shown successfully charge defendant with an "invasion" of any prior exclusive right possessed by it. Whatever curtailment of income it may suffer does not constitute a legal "impairment of its property rights and business," for the plain reason that lawful competition only is involved, and, as to that, it is not possessed of any "vested property right by virtue of its franchise." It is in no position to attack defendant's position.

More than four years have passed since plaintiff instituted this suit. Defendant's general demurrer was served April 20, 1942. The issue raised thereby is still pending. A mere eight days' notice of argument would have brought that issue for trial and decision. In that situation, we cannot now, as a court of review, determine what the trial court might or could do in respect to whether the attacked pleading should be sustained or overruled. Decision was and still remains initially for the trial court. It has not been asked to act. Absent action on its part, we have no right to assume that function. Nor have counsel briefed that issue or even raised it here. One would naturally think, in view of plaintiff's desire for immediate and effective action by means of the injunctive process, that it was seeking "a reality and not a sham, * * * a force for action and not merely a frothing of words." (From the address of Winston Churchill at Fulton, Missouri, March 1946.)

During these long years of inactivity, at least so far as determination of facts is concerned, five different judges of the St. Louis county trial bench have had a hand at one time or another in determining the various matters heretofore recited. Plaintiff's statutory injunction bond is for only $1,000 and its appeal bond $250. Clearly, therefore, the monetary amount involved is of little consequence.

■ Be that as it may, an important question here is whether the trial court properly exercised its sound discretionary power and acted within the appropriate limits fixed by the injunctive process, "since that is the strong arm of equity and calls for great caution and deliberation on the part of the court." 28 Am. Jur., Injunc-

tions, § 35. And the relief, to be granted, must be so limited as to accord with well-settled principles. Davis v. Forrestal, 124 Minn. 10, 144 N. W. 423, L. R. A. 1915F, 1012, Ann. Cas. 1915B, 448; Roraback v. Motion Picture M. O. Union, 140 Minn. 481, 168 N. W. 766, 169 N. W. 529, 3 A. L. R. 1290.

This was an interlocutory injunction. Here, too, the granting or denial of such relief must be left largely to the sound discretion of the trial court, whose action will not be disturbed on appeal unless it appears from the record that there has been an abuse of such discretion. In other words—

"* * * The applicable rule, reaffirmed in almost every case dealing with the matter, is that in the absence of some positive provision of the law to the contrary an injunction will not be granted in cases where there is a choice between the ordinary processes of law and the extraordinary remedy by injunction, and the remedy at law are sufficient to furnish the injured party the full relief to which he is entitled in the circumstances." 28 Am. Jur., Injunctions, § 37, and cases in note 19.

Among these are St. Paul Book & Stationery Co. v. St. Paul Gaslight Co. 130 Minn. 71, 153 N. W. 262, L. R. A. 1918A, 384, Ann. Cas. 1916B, 286; Kelly v. Minneapolis City, 57 Minn. 294, 59 N. W. 304, 26 L. R. A. 92, 47 A. S. R. 605. The same thought was expressed by this court in the Roraback case (140 Minn. 488, 169 N. W. 529, 3 A. L. R. 1294), where we said:

"* * * The right to and necessity for a temporary injunction is not so conclusively established that we feel required to order that one issue notwithstanding the refusal of the trial court to issue it. To direct its issuance under the circumstances would be, in effect, to determine the case upon affidavits, and the rights of the parties can be more satisfactorily determined after the parties adduce their evidence at the hearing upon the merits."

We conclude that defendant has statutory authority to engage in the electrical heat, light, and power business, and that plaintiff is not threatened with any financial loss because of any unlawful

competition by defendant, since lawful competition does not violate any of plaintiff's rights under its nonexclusive franchise.

Plaintiff's plain duty, in the circumstances shown, was to exercise "reasonable diligence to call into action" the powers of the court. Failing so to do, the "court may dismiss a suit where the plaintiffs' 'lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence.'" Holmberg v. Armbrecht, — U. S. —, 66 S. Ct. 582, 584, 90 L. ed. —.

Order affirmed.

Mr. Justice Magney and Mr. Justice Christianson took no part in the consideration or decision of this case.

[1]Reported in 22 N. W. (2d) 633.