VILLAGE OF BLAINE AND ANOTHER v. INDEPENDENT
SCHOOL DISTRICT NO. 12, ANOKA COUNTY, AND
OTHERS.

121 N. W. (2d) 183.

February 21, 1963—Nos. 38,644, 38,659.

10

*Edward G. Springer* and *Schultz & Springer,* for appellant village of Blaine.

*Joseph A. Maun, Jerome B. Simon,* and *Maun, Hazel, Green, Hayes, Simon & Aretz,* for appellant North Central Public Service Company.

*Joseph E. Hamilton* and *Howard, Peterson, LeFevere, Lefler & Hamilton,* for respondents Utilities Commission of village of Circle Pines and village of Circle Pines.

*Peter S. Popovich* and *Peterson & Popovich,* for respondent school district.

NELSON, JUSTICE.

Plaintiffs, the village of Blaine and North Central Public Service

Company, instituted this action to enjoin Independent School District No. 12, Anoka County, from contracting for construction of a gas distribution line to obtain gas from outside the village for school buildings located in Blaine and to enjoin the village of Circle Pines and its utilities commission from extending the gas distribution system of that village into Blaine and furnishing gas to buildings of the school district located there. The site of the school property is adjacent to the north side of County Road No. 10, the boundary between the two villages.

Independent School District No. 12, which was created pursuant to statute, covers an area in excess of 18 sections of land. It includes all of the villages of Circle Pines, Lexington, Lino Lakes, and Centerville and a small portion of Blaine. The villages of Blaine and Circle Pines are duly organized municipal corporations. North Central Public Service Company is an Iowa corporation duly qualified to transact business in this state as a public utility, which distributes natural gas under franchises granted by a number of cities and villages. On July 3, 1949, the village of Blaine granted North Central a nonexclusive franchise to establish and maintain a gas distribution system within the village. North Central is the sole franchise operator furnishing gas to consumers in Blaine and it maintains its gas line along the north side of County Road No. 10 adjacent to the school district's property. It has been able and willing at all times to supply gas for the school buildings and has offered to lay the necessary gas mains without charge to the school district.

The village of Circle Pines has constructed and is operating a municipal system for the distribution of gas pursuant to Minn. St. 412.321[1]

---

[1] § 412.321, subd. 1, provides: "Any village may own and operate any waterworks or gas, light, power, or heat plant for supplying its own needs for utility service or for supplying utility service to private consumers or both. It may construct and install all facilities reasonably needed for that purpose and may lease or purchase any existing utility properties so needed. It may, in lieu of providing for the local production of gas, electricity, water, or heat, purchase the same wholesale and re-sell it to local consumers. After any such utility has been acquired, the council, except as its powers have been limited through establishment of a public utilities commission in

and for its management has established a public utilities commission pursuant to § 412.331. The commission has constructed a gas distribution line running along the south side of County Road No. 10 parallel to the North Central line north of the road.

On November 13, 1961, the Anoka County District Court issued an order to show cause and a temporary restraining order enjoining defendants from contracting for construction of a gas distribution line for conducting natural gas from outside the village of Blaine into the property of the school district located within the village. After a hearing on December 13, 1961, the district court denied plaintiffs' motion for a temporary injunction.

The Centennial Senior and Junior High School buildings, owned and operated by the school district, are located wholly within the Blaine village limits. At the commencement of this action both buildings used fuel oil as their source of heat. The senior high school, however, was equipped with a dual type heating system which permitted use of either fuel oil or natural gas. The junior high school heating system was limited to the use of fuel oil, and funds would have to be expended to effect conversion to gas. The board of District No. 12 has contemplated a conversion from fuel oil to natural gas in both buildings for some time. In October 1961 it published an invitation for bids to cover installation of gas piping to the senior high school. North Central and Circle Pines Utilities Commission submitted contracts to the school board. The board accepted the bid of the utilities commission, which then asked the village of Blaine to permit it to extend its gas distribution across the boundaries of the village into the school building. Such permission is required by § 412.321, subd. 3.[2]

the village, shall make all necessary rules and regulations for the protection, maintenance, operation, extension, and improvement thereof and for the sale of its utility products."

[2]§ 412.321, subd. 3, provides in part:

"Any village may, except as otherwise restricted by this section, extend any such public utility outside its limits and furnish service to consumers in such area at such rates and upon such terms as the council or utility commission, if there is one, shall determine; *but no such extension shall be made into any incorporated municipality without its consent.*" (Italics supplied.)

The village of Blaine refused to give the requested permission. Thereupon the school district and the utilities commission decided to arrange for delivery of gas to the school district in Circle Pines. The plan called for a conveyance by the village to the school district of a plot within the Circle Pines village limits opposite the school district's property in Blaine; the construction by the district of a private gas line from its property in Blaine, across and under County Road No. 10, to the property conveyed to it by Circle Pines; and the connection of that gas line to the distribution system operated by Circle Pines. The Circle Pines Utilities Commission also agreed that it would pay the costs of any litigation arising out of the arrangement.

At the time this action was instituted plaintiffs obtained the temporary restraining order requiring defendants to refrain from contracting for construction of the proposed gas line and to show cause why a temporary injunction against such activity should not be granted. Plaintiffs appeal from the subsequent order of the district court denying a temporary injunction.

Upon the denial of a temporary injunction, defendants carried out the arrangement detailed above for supplying the school district with gas. They have urged upon this appeal that the law of the case was conclusively determined by the order denying the temporary injunction and that this order is a complete adjudication of all issues between the parties.

■ The granting of a temporary injunction, however, serves only to maintain the status quo until a case can be decided on the merits. 9 Dunnell, Dig. (3 ed.) § 4489. Thus, an order granting or refusing such remedy neither establishes the law of the case nor constitutes an adjudication of the issues on the merits. Only a trial on the merits has such effect.

■ Having in mind that the order denying the temporary injunction did not establish the law of the case and did not determine the issues involved, we will discuss some of the contentions advanced by the parties concerning such issues in order to direct attention to principles which should receive consideration in a trial upon the merits.

The first consideration must be the nature and standing of the fran-

chise granted by the village of Blaine to North Central and the rights of the plaintiffs under such grant. (Though not exclusive, thus far it is the only franchise granted by the village.) The ordinance granting the franchise establishes that the village council has granted to North Central a nonexclusive franchise and the right for the period of 25 years to "erect, construct, reconstruct, maintain, and operate within said Village, a gas distributing system, * * * for the distribution of gas for the purpose of selling, distributing and supplying gas to said Village and the inhabitants thereof * * *." The question thus logically arising is whether a consumer within the boundaries of the village of Blaine may buy natural gas from one who is not a franchise holder but sells and distributes such commodity outside of the village.

A franchise has been described as (8 Dunnell, Dig. [3 ed.] § 3807):

"* * * a special privilege conferred by the government upon an individual or corporation, which does not belong to citizens generally of common right; a privilege or immunity of a public nature, which cannot be legally exercised without legislative grant; a privilege conferred by grant from government and vested in individuals. *To constitute a franchise, the right possessed must be such as cannot be exercised without the express permission of the sovereign power*." (Italics supplied.)

In this state a franchise such as contemplated herein constitutes a property right and incorporeal hereditament. An estate in a franchise and an estate in land rest upon the same principle. See, McRoberts v. Washburne, 10 Minn. 8 (23).

Minn. St. 300.03 provides:

"Corporations may be organized for the construction, acquisition, maintenance, or operation of any work of internal improvement, including * * * any work for supplying the public * * * with water, light, heat, or power, including all requisite * * * pipes, and other conduits * * *. No corporation so formed shall construct, maintain, or operate * * * any * * * pipe line, or other conduit, * * * in or upon any street, alley, or other public ground of a city or village, *without first obtaining from the city or village a franchise conferring such right and compensating the city or village therefor*." (Italics supplied.)

Section 300.04 provides in part:

"The state shall at all times have the right to supervise and regulate the business methods and management of any such corporation and from time to time to fix the compensation which it may charge or receive for its services. *Every such corporation obtaining a franchise from a city or village shall be subject to such conditions and restrictions as from time to time may be imposed upon it by such municipality.*" (Italics supplied.)

It is clear that under the foregoing provisions and § 412.321 each municipality may elect whether it will provide its own utility system or grant franchises to private utilities to provide needed service. Should a municipality elect to maintain its own utilities, it may vest control of their functions and services in a public utilities commission pursuant to § 412.331 or allow the city council to retain such control. If a private utility is accorded a franchise to provide the service, it is subject to the control provided by § 300.04.

The village of Blaine contends that it has the right to determine which utility shall serve consumers within its boundaries and denies the contention of defendants that municipal franchises may be merely grants of authority to make use of public thoroughfares and that if the utility can provide service without the use of the city streets, alleys, or public grounds a municipality cannot prevent an unfranchised utility from providing its service to customers within its limits.

Defendants contend that § 412.321, subd. 3, should be construed to the effect that North Central has no right to operate in the village of Blaine free from competition and that customers within the village may still purchase gas from some other source as long as the sale and delivery can be accomplished without crossing village streets or alleys and as long as the competitor, even though it be another village, is authorized by law to engage in that particular business. They argue further that if a municipal franchise grants only the right to use the streets in a special manner in connection with a business, under certain conditions a competitor may transact business in a municipality without a franchise as long as the special use of the streets is unnecessary.

This case thus presents a genuine dispute as to the nature of the municipal franchise granted under § 300.03. In the course of the trial it will have to be determined whether the franchise rights here involved include all the territory within the municipal corporate limits or are limited under § 300.03 to "any street, alley, or other public ground of a city or village."

On whether an unfranchised utility may operate within the limits of a minicipality which has not given its consent, we refer to an article by Professor Frank William Hanft, *Control of Public Utilities in Minnesota*, 16 Minn. L. Rev. 457, 509, which concludes:

*"It is plain enough from the above statutes [§§ 300.03 and 300.04] that the ultilities dealt with may not operate in cities and villages without franchises from the cities and villages.* The language of some of the Minnesota decisions is to the same effect. A case decided in 1907 involved the question whether the plaintiff corporation had the right of eminent domain. Its business, as stated in its articles of incorporation, was to generate electricity and supply the current to the public for light, heat and power purposes. Objection was made that the company had received no municipal franchises. The court said:

" 'It may never be called upon to serve a city or village. If it does, it must obtain a franchise and submit itself to such further conditions and restrictions as from time to time may be imposed upon it by such municipality.'

"In a later case the court, speaking of an electric company, said: 'Before this franchise ordinance was enacted the respondent's predecessor and so the respondent, had no right whatever to maintain its system in the city of St. Paul.'

*"Clearly, then, the utilities specified in the above statutes must have municipal franchises if they are to do business in cities and villages.* This requirement constitutes a strong implication that cities and villages have authority to grant the required franchises. Such an implication should be considered in connection with any construction of specific grants of authority to municipalities over utilities found in the charters or incorporation acts under which the municipalities exist." (Italics supplied.)

It would seem that a franchise is necessary in order to "operate" in a municipality. To "operate," the utility must not only lay pipes and install equipment, but also must provide service, collect charges, and do other things necessary to conduct a utility business. Thus a franchise must be obtained not only to lay pipes to conduct gas across or over the boundaries of the village, or over its streets, alleys, and public grounds if necessary, but also to do all other things required to establish and to operate a utility. The grant of a right to maintain and operate public utilities within a municipality and to exact compensation therefor is a franchise. Griffin v. Oklahoma Natural Gas Corp. (10 Cir.) 37 F. (2d) 545, 547.

Some decisions hold that a grant of authority to enter upon and use the streets and alleys of a city or village constitutes a franchise. New Orleans Gas Co. v. Louisiana Light Co. 115 U. S. 650, 659, 6 S. Ct. 252, 257, 29 L. ed. 516, 520; State ex rel. City of Billings v. Billings Gas Co. 55 Mont. 102, 173 P. 799. We do not accept this interpretation, for a franchise includes a great deal more than the mere right to make use of city streets. We prefer the rule that the right to use the streets and alleys, even though it be for the purpose of providing utility service as a part of the franchise, constitutes an easement or license only. We refer to McPhee & McGinnity Co. v. Union Pac. R. Co. (8 Cir.) 158 F. 5, 10, in which it is stated:

"It is not, however, every privilege or permission granted by state or city to occupy or to use public rivers, highways, or streets that rises to the dignity of a franchise. A privilege granted by a city to a private party to occupy or use a portion of a public street temporarily for the construction of a building upon an abutting lot, for a cab stand, an apple stand, or for any similar commercial purpose is a license and not a franchise. * * *

* * * * *

"A right or privilege not essential to the general function or purpose of the grantee, and of such a nature that a private party might grant a like right or privilege upon his property, such as a temporary or revocable permission to occupy or use a portion of some public ground, highway, or street, is a license and not a franchise."

The power to grant franchises is a high legislative trust, delegated to municipalities in this state. Kuehn v. Village of Mahtomedi, 207 Minn. 518, 292 N. W. 187.

Clearly in this state each municipality has the authority to grant franchises to those whom it deems best qualified and who willingly subject themselves to the control vested in the municipality. If a municipality refuses to consent to an application from a private or municipal utility to provide service within its boundaries, it has statutory authority to prevent such utility from providing such service therein competitive to franchised utilities operating therein. We cannot evade the explicit statutory provisions quoted previously, which apply to both cities and villages. The statement of the Ontario appellate court in Township of Barton v. City of Hamilton [1890] 18 Ont. 199, 202, represents our position also:

"The cardinal principle of municipal government is that each municipality should be as far as possible self-governing in matters of police and municipal jurisdiction, and that one municipality should not invade the territory or interfere with the concerns of another municipality without the consent of the latter or the adjustment of points of difference by the means of arbitration or other appropriate tribunal."

■ We must also consider whether the police power has application to utilities. Franchises are given to utilities in order to provide essential public services. These must be subject to reasonable provisions for the protection of the consumer and the public.

This court, in Kuehn v. Village of Mahtomedi, 207 Minn. 518, 292 N. W. 187, stated that providing a community's water supply system partakes of a governmental function while furnishing water for power purposes usually does not since it is usually furnished by private capital for pecuniary gain. We also pointed out that the former has to do with health, cleanliness, fire protection, and the like, while the latter generally has to do with private enterprise. Also see, White v. City of Meadville, 177 Pa. 643, 35 A. 694, 34 L. R. A. 567.

The furnishing of heat, light, power, and gas also is properly within the scope of the police power and therefore subject to control and regu-

lation by a municipality. Permitting unfranchised utilities to operate competitively in any city or village would foreclose governmental control of these essential services and thereby endanger the prosperity, health, welfare, and safety of those living within the municipal boundaries. In Grand Trunk Western Ry. Co. v. City of South Bend, 227 U. S. 544, 553, 33 S. Ct. 303, 306, 57 L. ed. 633, 639, the court discussed the subject of municipal control as follows:

"* * * the rights acquired were subject to the power of the municipality to pass reasonable regulations necessary to secure the public safety. * * * The city could, therefore, legislate as to crossings, grades, character of rails, rate of speed, giving of signals and the details of operating track and train, regarding the use of the franchise, and preserving the concurrent rights of the public and the company."

Defendants cite as authority for sustaining the order appealed from, two opinions of the attorney general. One held that an industry with property located on a river bank at the city limits of a city operating its own utility system could purchase electric power from a private utility which maintained power lines immediately across the river and was willing to run lines into the buyer's plant. Opinion Attorney General, No. 624-C-6, February 27, 1952. There the proposed hookup would not cross city property. The other opinion cited by defendants was based on this controversy and ruled that the village of Circle Pines could furnish gas to the school district if the district took delivery within Circle Pines and piped the gas to its buildings. Opinion Attorney General, No. 476b-1, March 30, 1960. Apparently the trial court relied on that opinion, saying in its memorandum accompanying the order denying a temporary injunction:

"* * * We do not deem it necessary to construe the statute under the facts and circumstances here presented."

While the attorney general's opinions are entitled to careful consideration, they are not binding upon the courts. Mattson v. Flynn, 216 Minn. 354, 13 N. W. (2d) 11; County of Hennepin v. County of Houston, 229 Minn. 418, 39 N. W. (2d) 858.

Defendants rely also upon General Minnesota Utilities Co. v.

Carlton County Co-op. Power Assn. 221 Minn. 510, 22 N. W. (2d) 673. In that case plaintiff, holder of a nonexclusive franchise, attempted to enjoin defendant, who did not have a franchise but had secured a permit from the village to run a power line across certain streets of the village to a creamery which defendant desired to furnish with electric power. The case is distinguishable from this one since the defendant there had authority from the municipality to enter the village and run its wires. The point in issue was the legal significance of a "permit" as opposed to a nonexclusive franchise. The significance of the holding is that one having a grant of authority, whether by permit or franchise, may exercise that authority within the limits of the grant.

Alabama Power Co. v. Ickes, 302 U. S. 464, 58 S. Ct. 300, 82 L. ed. 374, cited by defendants, does not apply since it involved an attempt to prevent a municipality from operating a utility system in competition with one of its own franchise holders. It was made clear in that case that a municipality which has granted a nonexclusive franchise may operate a municipal utility in the same field. The question in the instant case is whether an outside competitor holding no franchise, permit, or grant of authority from the municipality in which it wishes to operate has any right to enter and provide a similar service.

Defendants cite the case of City of Lawrence v. Methuen, 166 Mass. 206, 44 N. E. 247, as authority for supporting the contract between the village of Circle Pines and the school board. In that case, Arlington Mills, a local industry, owned land and buildings both in Lawrence and the town of Methuen. The Massachusetts court held (166 Mass. 209, 44 N. E. 248):

"* * * Where a person or corporation owns land on both sides of the boundary line between the town and the city of Lawrence, which is a *continuous parcel wholly in the occupation of the owner, and on which there are buildings in both the town and the city in which water is used,* we see nothing in the statute which prevents the town from furnishing within its limits all the water which such an owner or occupant needs to use on the premises." (Italics supplied.)

The facts in that case are distinguishable from the facts here. It was clear that the property involved was a continuous parcel (not severed by highway) wholly occupied by the owner, on which there were buildings in both the town and the city. In the instant case a small plot was furnished to the school district without cost by Circle Pines for the sole purpose of evading the consent requirement of § 412.321, subd. 3; there were no buildings on the plot; and it is separated from the district's property in Blaine by a road. The only physical appurtenance upon the school's property in Circle Pines is the end of the gas main constructed from the high school building in Blaine. Obviously the physical situation here differs materially from the situation in the Massachusetts case. Moreover, when that case was decided, Massachusetts had no statute comparable to § 412.321, subd. 3.

Plaintiffs have cited as controlling Incorporated Town of Ackley v. Central States Elec. Co. 204 Iowa 1246, 214 N. W. 879, 54 A. L. R. 474, and Holston River Elec. Co. v. Hydro Elec. Corp. 17 Tenn. App. 122, 66 S. W. (2d) 217.

In the Ackley case the Iowa court said (204 Iowa 1249, 214 N. W. 880):

"* * * If this process were allowed, then the electric company would have all the rights it would have under a franchise, without having procured one by the vote of the people, as required by the aforesaid sections of the statute. Such a nullification of the statute will not be countenanced by an equity court."

In the Holston case the Tennessee court said (17 Tenn. App. 132, 66 S. W. [2d] 222):

"* * * To license and affirm an act of this kind for this party would mean that any corporation or individual could do likewise, and by so doing destroy the investment of the complainant, Holston River Electric Company, in the town of Rogersville, notwithstanding the fact that it had been lawfully permitted to make its investments there, and notwithstanding the fact that the Hydro Electric Corporation had been decreed to have no rights to operate in said town. Such a holding would deprive it of its rights and opportunities

for earning on its investment. We think that this would certainly be taking private property without due process of law."

■ The usual remedies for the protection of property rights generally are available for the protection of franchise rights and privileges, including injunctions to prevent unlawful invasion or interference with such rights. Riss & Co. v. Assn. of American Railroads (D. D. C.) 178 F. Supp. 438. In this state an action at law for damages lies for wrongful interference with a franchise. However, where this remedy may be inadequate, an unjunction will be granted. 8 Dunnell, Dig. (3 ed.) § 3815.

The holder of a nonexclusive franchise may resort to a court of equity to restrain an illegal, injurious invasion of his property rights. See, Frost v. Corporation Comm. 278 U. S. 515, 49 S. Ct. 235, 73 L. ed. 483; People's Transit Co. v. Henshaw (8 Cir.) 20 F. (2d) 87, 90; New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 76 L. ed. 747.

It is undisputed that the franchise in the instant case was nonexclusive in character. That fact, however, does not imply that any other utility distributing gas may enter into competition in Blaine at any time without the consent of the village, whether that consent be in the form of a license, an easement, a permit, or a franchise. But, neither does it imply that the village itself may not enter into competition with North Central if the municipality so desires.

■ Minn. St. 585.02[3] states the conditions under which a temporary injunction may be authorized. Within the limits prescribed by the statute, the allowance of a temporary injunction rests largely in judicial discretion, to be exercised with reference to the facts of the

---

[3]§ 585.02 provides: "When it appears by the complaint that the plaintiff is entitled to the relief demanded, and such relief consists wholly or partly in restraining the commission or continuance of some act which, if permitted during the litigation, would work injury to the plaintiff, or when during the litigation it appears that the defendant is about to do, or is doing, or threatening, procuring, or suffering to be done, some act in violation of plaintiff's rights respecting the subject of the action, and tending to make the judgment ineffectual, a temporary injunction may be granted to restrain such act. * * *"

particular case and with regard to the relative injury and inconvenience which may be likely to result to the parties from the allowance or disallowance of such relief. 9 Dunnell, Dig. (3 ed.) § 4490.

■ The United States Supreme Court in Rice & Adams Corp. v. Lathrop, 278 U. S. 509, 515, 49 S. Ct. 220, 222, 73 L. ed. 480, 483, held that the jurisdiction of a lower court sitting in equity, having been rightfully invoked, was not lost because an interlocutory injunction was denied. The court stated:

"* * * This conclusion finds support in the principle that 'a court of equity ought to do justice completely and not by halves,' and to this end, having properly acquired jurisdiction of the cause for any purpose, it will ordinarily retain jurisdiction for all purposes, including the determination of legal rights that otherwise would fall within the exclusive authority of the court of law."

This court has held that where circumstances are such as to lead the court to believe it quite probable that upon a final hearing the material allegations of the complaint will turn out to be true, a temporary injunction is proper. Pineo v. Heffelfinger, 29 Minn. 183, 12 N. W. 522; Stees v. Kranz, 32 Minn. 313, 20 N. W. 241; Neill v. City of Red Wing, 156 Minn. 467, 195 N. W. 145.

Neither the denial of the temporary injunction nor the fact that defendants have carried out their plan for furnishing the school buildings with gas through connection of a private gas line to the Circle Pines distribution system is decisive of the ultimate outcome of the action since the issues require a trial upon the merits. Upon the record it would appear under the circumstances so far disclosed that the court might well have continued the temporary restraining order in force until such trial. It will serve no useful purpose, however, under present circumstances to reverse on the ground that the trial court abused its discretion.

Remanded for trial.

UPON APPEAL FROM CLERK'S DISALLOWANCE OF COSTS AND DISBURSEMENTS.

On April 19, 1963, the following opinion was filed:

PER CURIAM.

This is an appeal from the clerk's disallowance of respondents' costs and disbursements. The taxation of costs and disbursements in this court is governed by Minn. St. 607.01 and Supreme Court Rule XV. Section 607.01 provides:

"Costs in the supreme court may be allowed, in the discretion of the court, as follows:

"(1) To the prevailing party, upon a judgment in his favor on the merits, not exceeding $25;

\*     \*     \*     \*     \*

"In all cases the prevailing party shall be allowed his disbursements necessarily paid or incurred."

Rule XV (222 Minn. xxxvii) provides in part:

"Unless otherwise ordered the prevailing party shall recover costs as follows:

"1.   Upon a judgment in his favor on the merits, $25.

"2.   Upon dismissal, $10."

Respondents allege that the sole question on this appeal was a determination of the validity of the order of the district court denying appellants' motion for a temporary injunction, asserting that since we did not declare the denial of the injunction improper we impliedly sustained the trial court's decision. Appellants contend that since we neither affirmed nor reversed, respondents could not have prevailed. Thus, the question here is whether either party prevailed.

Generally, the appellant prevails if he secures a reversal or modification of the order or judgment from which the appeal is taken, and the respondent prevails if he secures affirmance without modification. Sanitary Farm Dairies, Inc. v. Wolf, 261 Minn. 166, 112 N. W. (2d) 42.

In this case we neither affirmed, reversed, nor modified the lower court's order denying appellants' motion for a temporary injunction, since during the pendency of the appeal respondents went ahead and completed the construction of the gas line which appellants had sought to enjoin. Had the district court continued its restraining order in effect during the appeal, the result might have been different.

On the appeal we considered the legality of respondents' proposed plan under the prevailing Minnesota statutes and relevant case law, commenting generally upon their application in light of the facts available to us. We further commented collaterally upon the lower court's denial of appellants' motion for temporary injunction, stating that a temporary injunction serves only to maintain the status quo until a case can be decided on the merits and that an order granting or refusing such remedy neither establishes the law of the case nor constitutes an adjudication of the issues on the merits. We ultimately concluded:

"Neither the denial of the temporary injunction nor the fact that defendants have carried out their plan for furnishing the school buildings with gas through connection of a private gas line to the Circle Pines distribution system is decisive of the ultimate outcome of the action since the issues require a trial upon the merits. Upon the record it would appear under the circumstances so far disclosed that the court might well have continued the temporary restraining order in force until such trial. It will serve no useful purpose, however, under present circumstances to reverse on the ground that the trial court abused its discretion."

Since there are questions of fact yet undetermined, we had no alternative but to remand for trial on the merits. We hold that under circumstances so presented, neither party can be considered "prevailing." In the interest of a just and equitable result we hereby order that the present costs and disbursements thus far accrued should await the final outcome of the forthcoming trial on the merits, and be recoverable by the party who ultimately succeeds. Walker v. Barron, 6 Minn. 353 (508).

The disallowance of costs and disbursements by the clerk is affirmed.

MR. JUSTICE SHERAN, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.